UNITED STATES DISTRICT COURT　　　　　　　　ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

JOSEPH FERRARA, CARMINE VALENTE,
MIKE EMANUELE, JOSEPH GRECO,
ARTHUR REIS, ANTHONY SCACCIA,
ANGELO DEPRINO,

　　　　　　　　　　　　　　　　MEMORANDUM
　　　　　　　　Plaintiffs,　　　　AND ORDER
　　　　　　　　　　　　　　　　11-CV-5183
　　　- versus -

QUADROZZI EQUIPMENT LEASING
CORP.,

　　　　　　　　Defendant.

APPEARANCES:

　　　WELBY, BRADY & GREENBLATT, LLP
　　　　　　11 Martine Avenue, 15th Floor
　　　　　　White Plains, New York  10606
　　　By:　　Alexander A. Miuccio
　　　　　　*Attorneys for Plaintiffs*

　　　JAMES N. KLATSKY
　　　　　　115 Broadway
　　　　　　New York, NY  10006
　　　By:　　James N. Klatsky
　　　　　　*Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

　　　　　Plaintiffs, trustees of the New York City Ready-Mix Concrete Industry Advancement Fund ("Fund"), commenced this action against Quadrozzi Equipment Leasing Corporation ("QEL") pursuant to § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Plaintiffs allege that QEL failed to make contributions to the Fund in breach of two collective bargaining agreements entered into between QEL and Local 282 of the International Brotherhood of Teamsters ("Local 282") in 2008 and 2011. Plaintiffs seek unpaid

contributions, plus interest, from 2008 to 2011. Pending before the Court is plaintiffs' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). For the reasons explained below, I deny plaintiffs' motion and dismiss the complaint for lack of standing.

BACKGROUND

A. *The Fund*

The Fund was established pursuant to a series of collective bargaining agreements between the Association of New York City Concrete Producers, Inc. ("Association") and Local 282. Pl. Mot. Summ. J., Ex. B ("Trust Agreement"), ECF. No. 30; Ferrara Aff. ¶ 3, ECF No. 30.[1] The Association is a trade association of ready-mix concrete businesses within New York City. Ferrara Aff. ¶ 4. The purported purpose of the Fund is to promote the use of ready-mix concrete in various industries and to support the general welfare of the ready-mix concrete industry.[2] Pl. Mot. Summ. J., Ex. B ¶ 4(b) ("Trust Agreement").

The collective bargaining agreements between Local 282 and the Association ("Union-Association Agreements") require employers in the Association to make contributions to the Fund for every hour worked by an employee covered under an agreement. Pl. Opp. Mot.

---

[1] Affidavits "must present evidence which is admissible and must not only be made on the personal knowledge of the affiant but must show that he possesses the knowledge asserted." *Universal Film Exchanges, Inc. v. Walter Reade, Inc.*, 37 F.R.D. 4, 5 (S.D.N.Y. 1965); Fed. R. Civ. P. 56(c)(4). Joseph Ferrara's affidavit, submitted on behalf of plaintiffs' motion for summary judgment, and John Quadrozzi's affidavit, submitted on behalf of QEL's opposition to the motion, contain a mixture of facts and legal argument. *See, e.g.*, Pl.'s Mot. Summ. J., Ferrara Aff. ¶ 16 ("The plaintiff Trustees dispute each assertion set forth in the First Affirmative Defense. The Fund is not under the domination or control of the Association."); QEL Opp. to Mot. Summ. J., Quadrozzi Aff. ¶ 7 ("Plaintiff admits that the trustees of the Fund are nominated by the Association, but asserts that the Fund is not controlled by the Association because its trustees have discretion over its operation. This is a meaningless distinction."). Accordingly, I will only admit as evidence those portions of these affidavits that present clear statements of fact made on the personal knowledge of the affiant.

[2] The trustees amended the trust agreement in 1994. Pl. Mot. Summ. J., Ex. C ("Amendment"). The original agreement established the Fund's purpose as promoting the use of various ready-mix materials, not just concrete. The amended trust agreement narrowed the purpose of the Fund to focus solely on the promotion of ready-mix concrete. The amended trust agreement also added that the purpose of the Fund was "[t]o promote labor harmony and stability in the ready-mix concrete industry by acting on behalf of its members with respect to their common labor problems." *Id.*

to Vacate Default, Miuccio Aff. ¶ 3, ECF No. 17.[3] In 1977 the Association executed a trust agreement, designating trustees to administer the Fund. Pl. Mot. Summ. J., Ex. B ("Trust Agreement"). Plaintiffs Joseph Ferrara, Carmine Valente, Mike Emanuele, Joseph Greco, Arthur Reis, Anthony Scaccia, and Angelo Deprino are the current trustees of the Fund.[4] Compl. ¶ 6, ECF No. 1.

B.  *QEL's Membership in the Association*

QEL was formerly a member of the Association. Quadrozzi Aff. ¶ 5, ECF No. 33. On July 1, 2008 QEL withdrew from the Association. *Id*. On July 3, 2008 the Association notified Local 282 by letter that QEL had withdrawn from the Association. Pl. Mot. Summ. J., Ex. F ("Association Letter"). The letter informed Local 282 that QEL "is released from any obligations it may have as a member of the Association." *Id*. It further stated that "[t]he Association does not object to [QEL] and [Local 282] negotiating and entering into an independent collective bargaining agreement." *Id*.

C.  *First Collective Bargaining Agreement between QEL and Local 282 – 2008-2011*

On September 25, 2008 QEL entered into a Memorandum of Agreement – effective (retroactively) from July 1, 2008 to June 30, 2011 – with Local 282 ("First QEL-Union

---

[3] Plaintiffs rely on an affidavit from Alexander Miuccio, who is also counsel for plaintiffs, as record evidence for purposes of their motion for summary judgment. Miuccio submitted this affidavit as part of plaintiffs' opposition to QEL's motion to vacate default. Miuccio's submission of an affidavit setting forth personal knowledge of the events providing the basis for this action conflicts with his role as counsel. *See* N.Y. Rule of Professional Conduct 3.4(d)(2)-(3) ("A lawyer shall not . . . in appearing before a tribunal on behalf of a client: . . . assert personal knowledge of facts in issue except when testifying as a witness . . . ."); 3.7 (a) ("A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless: (1) the testimony relates solely to an uncontested issue; (2) the testimony relates solely to the nature and value of legal services rendered in the matter; (3) disqualification of the lawyer would work substantial hardship on the client; (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or (5) the testimony is authorized by the tribunal.") However, because QEL has not objected to the admissibility of Miuccio's affidavit pursuant to Fed. R. Civ. P. 56(c)(2), I will admit testimony in the affidavit for purposes of deciding the present motion.
[4] The original trustees were Joseph Vigliarolo, Edward Ryan, Francis Princips, George Negri, and John Quadrozzi. Pl. Mot. Summ. J., Ex. B ¶ 4(b) ("Trust Agreement"). John Quadrozzi founded QEL; his son, John Quadrozzi, Jr. is now the current president of the company. QEL Reply Mot. to Vacate Default, Quadrozzi Aff. ¶¶ 1, 5, ECF No. 20.

3

Agreement"). *Id*., Ex. D. The agreement provided that QEL and Local 282 "shall be bound by the terms of the collective bargaining agreement between Local 282 and the Association . . . that is in effect for the period of July 1, 2008 through June 30, 2011." *Id*. ¶ 2. The agreement also added several terms, including the establishment of a "Good Labor Practice Committee," and the option to unilaterally extend the agreement up to July 31, 2011. *Id*. ¶¶ 3-4.

QEL did not make any contributions to the Fund from July 1, 2008 to June 30, 2011. Ferrara Aff. ¶ 14. QEL ceased producing ready-mix concrete upon the conclusion of the first collective bargaining agreement. Quadrozzi Aff. ¶ 14 n.2; Ferrara Aff. ¶ 14 ("Quadrozzi submitted monthly remittance reports to [Local 282] for the period from July 1, 2008 to August 31, 2011. Thereafter, Quadrozzi did not submit remittance reports to Local 282 because it ceased operating its ready-mixed concrete trucks.")

D.  *Second Collective Bargaining Agreement between QEL and Local 282 – 2011-2016*

Sometime before the conclusion of the first collective bargaining agreement between QEL and Local 282, QEL and eight other concrete companies formed the New York City Concrete Producer Coalition ("Coalition"). Quadrozzi Aff. ¶ 14; Ferrara Aff. ¶ 12. The Coalition executed a Memorandum of Agreement with Local 282 on June 14, 2011, which is effective until June 30, 2016.[5] Pl. Mot. Summ. J., Ex. G ("Second QEL-Union Agreement"). The agreement provides that "[t]he terms of the Agreement shall be the same as the terms of the Association . . . Agreement with Local 282 that by its terms expires on June 30, 2011," subject to several modifications. *Id*. ¶ 2. Among the modifications is the provision that contributions to the Fund be lowered from $0.90 to $0.10. *Id*. ¶ T.

---

[5] The Association was involved in the negotiations for this Memorandum of Agreement, even though QEL and other members of the Coalition were not members of the Association. Quadrozzi Aff. ¶ 14 ("The Association worked together with QEL as part of the Coalition throughout the long process of negotiating a new contract . . . .").

E.   *Procedural History*

Plaintiffs, trustees of the Fund, commenced this action on October 25, 2011. *See* Compl., ECF No. 1. On February 6, 2012, the Clerk of the Court entered default against QEL pursuant to Fed. R. Civ. P. 55(a). On May 15, 2012 QEL filed a motion to vacate default pursuant to Fed. R. Civ. P. 55(c). *See* QEL Mot. to Vacate Default, ECF No. 15. I referred that motion to Magistrate Judge Lois Bloom by order dated May 16, 2012. On July 9, 2012, Magistrate Judge Bloom issued a report and recommendation to grant QEL's motion and vacate default. Report & Recommendation, ECF No. 21. I accepted Magistrate Judge Bloom's report and recommendation by order dated September 13, 2012. QEL filed its answer to the complaint on September 24, 2012. *See* Answer, ECF No. 25.

On February 1, 2013 plaintiffs filed a motion for summary judgment. *See* Pl. Mot. Summ. J., ECF No. 30; *see also* Pl. Mem. Support Mot. Summ. J., ECF No. 31. The motion relies on facts derived from affidavits and exhibits filed in connection with QEL's motion to vacate default. I heard oral argument on the motion on March 14, 2013.

## DISCUSSION

A.   *Summary Judgment Standard*

A court may grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

B.      *Standing*

As a threshold matter, plaintiffs' claim raises serious questions of standing, which I must resolve before proceeding to an examination of the merits. *Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("Standing is 'the threshold question in every federal case, determining the power of the court to entertain the suit.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth*, 422 U.S. at 498. "Because the standing issue goes to th[e] Court's subject matter jurisdiction, it can be raised *sua sponte*." *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir. 2005); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-31 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'") (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

The standing inquiry consists of two strands: "constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth*, 422 U.S. at 498. "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III" of the United States Constitution. *Id*. "The Article III limitations are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 12 (2004) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The prudential

6

dimension of standing "encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Id*. (quoting *Allen*, 468 U.S. at 751).

Plaintiffs bring this action pursuant to § 301 of the LMRA as trustees of the Fund, which they allege "stands in the position of a third-party beneficiary" of the First QEL-Union Agreement. Pl. Mem. in Support Mot. Summ. J., at 5. Thus, the standing inquiry here implicates both the constitutional and prudential dimensions. The constitutional dimension requires a determination of whether plaintiffs have Article III standing as third-party beneficiaries to the First QEL-Union Agreement. The prudential dimension requires a determination of whether plaintiffs' complaint falls within the "zone of interests" protected by § 301 of the LMRA.[6] I conclude that plaintiffs lack statutory standing, and therefore, need not reach the question of whether plaintiffs have Article III standing.

1. *Statutory Standing*

Plaintiffs lack statutory standing under § 301 of the LMRA. "In addition to the immutable requirements of Article III, 'the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.'" *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474-75 (1982)). "Like their constitutional counterparts, these 'judicially self-imposed limits on the exercise of federal jurisdiction' are 'founded in concern about the proper – and properly limited – role of the courts in a democratic society." *Id*. (quoting *Allen*, 468 U.S. at 751, and *Warth*, 422 U.S. at 498). Among these prudential principles

---

[6] The Supreme Court has described this latter inquiry as one of "statutory standing." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 97 (1998) ("[W]hether . . . the plaintiff came within the 'zone of interests' for which the cause of action was available . . . is an issue of *statutory* standing.") (emphasis in original).

7

is the doctrine "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit."[7] *Id*.

Whether a plaintiff's grievance "arguably fall[s] within the zone of interests protected . . . by the statutory provision" is to be determined "not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies." *Id*. at 175. Plaintiffs bring their action pursuant to § 301 of the LMRA. In *Textile Workers Union of America v. Lincoln Mills*, the Court noted that the "legislative history of s 301 is somewhat cloudy and confusing," but that "a few shafts of light . . . illuminate our problem":

> Both the Senate Report and the House Report indicate a primary concern that unions as well as employees should be bound to collective bargaining contracts. But there was also a broader concern – a concern with a procedure for making such agreements enforceable in the courts by either party. At one point the Senate Report states, "We feel that the aggrieved party should also have a right of action in the Federal courts. Such a policy is completely in accord with the purpose of the Wagner [National Labor Relations] Act which the Supreme Court declared was 'to compel employers to bargain collectively with their employees to the end that an employment contract, binding on both parties, should be made . . . .'"
>
> . . . As stated in the House Report, the new provision "makes labor organizations equally responsible with employers for contract violations and provides for suit against the other in the United States district courts." To repeat, the Senate Report summed up the philosophy of s 301 as follows: "Statutory recognition of the collective agreement as a valid, binding, and enforceable contract is a logical and necessary step. It will promote a higher degree of

---

[7] The early zone of interests cases employed this test to suits under the Administrative Procedure Act. But the Supreme Court has recognized that "later cases have applied it also in suits not involving review of federal administrative action and have specifically listed it among other prudential standing requirements of general application." *Bennett*, 520 U.S. at 163 (citing *Dennis v. Higgins*, 498 U.S. 439, 449 (1991); *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 320-21, n.3 (1977)).

8

> responsibility upon the parties to such agreements, and will thereby promote industrial peace."

353 U.S. 448, 453-54 (1957) (internal citations omitted); *see also Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962) ("The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace.").

Not surprisingly, the "ordinary § 301 case is a contract claim in which a party to the collective-bargaining agreement expressly asserts that a provision of the agreement has been violated." *International Brotherhood of Electrical Workers, AFL-CIO v. Hechler*, 481 U.S. 851, 857 (1987). But courts have recognized that the scope of § 301 extends beyond suits involving an employer and a union. Thus, "[i]t has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement." *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 163 (1983); *Smith v. Evening News Association*, 371 U.S. 195, 200 (1962) ("The rights of individual employees concerning rates of pay and conditions of employment are a major focus of the negotiation and administration of collective bargaining contracts. . . . To exclude these claims from the ambit of s 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law."). An individual employee may also bring suit against his union for tort claims "derive[d] from the rights and obligations established by the contract," *see, e.g.*, *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 217 (1985), or against both his employer and union, in what is typically described as a "hybrid § 301/fair representation claim." *DelCostello*, 462 U.S. at 165; *Hague v. United Paperworks International Union*, 949 F.Supp. 979, 984 (N.D.N.Y. 1996) ("Since . . . employees are generally required to

9

invoke an arbitration mechanism in any [collective bargaining] agreement, courts have implied a cause of action against the union representing the bargaining unit to ensure that the employees interests are fairly represented.").

The courts have also recognized suits pursuant to § 301 of the LMRA by trustees of employee benefit funds against contributing employers, a type of third-party beneficiary action analogous to the present case. *See, e.g.*, *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364 (1984); *Lewis v. Benedict Coal Corporation*, 361 U.S. 459 (1960); *O'Hare v. General Marine Transport Corp.*, 740 F.2d 160 (2d Cir. 1984). In *Lewis*, the Court observed that a collective bargaining agreement that provided for an employee benefit fund, was "not a typical third-party beneficiary contract" for "[t]he promisor's interest in the third party . . . goes far beyond the mere performance of its promise to that third party." 361 U.S. at 468. It explained this anomaly by looking to the labor context in which these types of agreements are forged: "It is a commonplace of modern industrial relations for employers to provide security for employees and their families to enable them to meet problems arising from unemployment, illness, old age or death. . . . [T]his welfare fund was jointly created by the . . . industry and the union for that purpose." *Id*.

The various iterations of suits brought under § 301 of the LMRA all address issues at the core of collective bargaining agreements, the enforcement of which Congress recognized as critical to "promot[ing] industrial peace." *Textile Workers*, 353 U.S. at 448. In particular, these suits are brought to vindicate rights conferred by collective bargaining agreements upon the core parties to such agreements – employers, unions, and employees. *See, e.g.*, *Smith*, 371 U.S. at 199-200 ("Section 301 has been applied to suits to compel arbitration of such individual grievances as rates of pay, hours of work and wrongful discharge; to obtain

specific enforcement of an arbitrator's award ordering reinstatement and back pay to individual employees; to recover wage increases in a contest over the validity of the collective bargaining contract; and to suits against individual union members for violation of a no-strike clause contained in a collective bargaining agreement."). Thus, the plaintiffs bringing such suits all fall squarely within the zone of interests protected by § 301 of the LMRA.

By contrast, the present case is brought by the trustees of an industry advancement fund, whose stated purpose is to benefit the "general welfare" of the ready-mix concrete industry. Pl. Mot. Summ. J., Ex. B ¶ 4(b). This type of fund is clearly distinguishable from employee benefit funds, which are established with the explicit purpose of providing some form of security to employees and their families. In fact, in a prior case brought by the Fund against another employer in this circuit, the court found that "the Fund was not established to benefit employees." *Quadrozzi v. Valente Sand and Stone Corp.*, No. 89-cv-8102, 1991 WL 255121, at *1 (S.D.N.Y. Nov. 19, 1991). While it may be argued that industry advancement funds promote industrial stability, such funds are not at the core of collective bargaining agreements between employers and unions, nor do they directly affect the core parties to such agreements. As such, I conclude that plaintiffs do not fall within the zone of interests protected by § 301 of the LMRA.

## CONCLUSION

For the reasons stated above, the plaintiffs' motion for summary judgment is denied and the complaint is dismissed in its entirety.

So ordered.


John Gleeson, U.S.D.J.

Dated: June 25, 2013
      Brooklyn, New York